949 So.2d 833 (2006)
Deella WATTS, Appellant,
v.
HORACE MANN LIFE INSURANCE COMPANY and Leo Hawkins, Jr., Appellees.
No. 2005-CA-00253-COA.
Court of Appeals of Mississippi.
October 17, 2006.
*834 Precious Tyrone Martin, Dawn Laverne Stough, attorneys for appellant.
Arthur F. Jernigan, Samuel Ernest Linton Anderson, Staci Bozant O'Neal, Ridgeland, attorneys for appellees.
Before MYERS, P.J., SOUTHWICK, IRVING and BARNES, JJ.

MODIFIED OPINION ON MOTION FOR REHEARING[1]
IRVING, J., for the Court.
¶ 1. DeElla Watts purchased insurance policies from Horace Mann Life Insurance Company, covering the lives of two people. The record and briefs, including those of the plaintiff, variously describe the insureds as two of Watts's children or as one of her children and a grandchild. The difference is unimportant for our review. It appears that a child and grandchild were insured. Fortunately, no claim for the death benefits arose. Shortly after the expiration of the policies, Watts sued Horace Mann and Leo Hawkins, Horace Mann's salesman, on the theory that Horace Mann had misrepresented the nature of the policy to her. After discovery, the Sharkey County Circuit Court granted Horace Mann's motion for summary judgment. Watts now appeals and contends that the grant of summary judgment was improper. There was no error, and we affirm.

FACTS
¶ 2. Watts purchased her first "joint life" policy from Horace Mann in 1990. She purchased her second such policy in 1993. As of 2003, both policies had expired and Watts declined to purchase new ones. Watts claims that Horace Mann and Hawkins, as its agent, told her that the policies covered both insureds  if one person died, the other would still be insured until the expiration of the policy. In reality, the policies were "joint life" policies that covered the death of either person, but would not provide benefits to both unless they died within thirty-one days of each other. The survivor would be entitled to a new policy without proof of insurability. Apparently the premiums on such a new policy would be at the then-applicable, potentially higher rate since the insured would be older than when the joint policy was acquired. Watts brought suit against Horace Mann on January 22, 2004, claiming several different theories of recovery.
*835 ¶ 3. During discovery, Watts produced an affidavit by Matthew Thomas, an insurance agent offered as an expert. Thomas opined that the language of the policy purchased by Watts would "lead a reasonable person to the conclusion that both insureds, Antonio Watts and Felicia Watts, would have two separate ten year level term policies in one, single contract." Several depositions were taken, and the policy language was produced for the court to review. After discovery was complete, the court granted summary judgment to Horace Mann on the grounds that Watts's claim was time-barred and that her claim was made moot by the termination of the policies in 2003. Additional facts will be related as necessary during our discussion of the issue.

ANALYSIS AND DISCUSSION OF THE ISSUE
Standard of Review
¶ 4. When reviewing the grant or denial of summary judgment, we look at a lower court's decision de novo. Price v. Purdue Pharma Co., 920 So.2d 479, 483(¶ 10) (Miss.2006). In reviewing whether summary judgment is proper, we look at "all evidentiary matters, including admissions in pleadings, answers to interrogatories, depositions, and affidavits." Aladdin Constr. Co. v. John Hancock Life Ins. Co., 914 So.2d 169, 174(¶ 9) (Miss.2005) (citations omitted). When reviewing the evidence, we look at it "in the light most favorable to the party against whom the motion for summary judgment has been made." Price, 920 So.2d at 483(¶ 10) (citing Aetna Cas. & Sur. Co. v. Berry, 669 So.2d 56, 70 (Miss.1996)). If we find that any genuine issue of material fact exists, the decision of the lower court must be reversed. Id. at 484(¶ 10). However, the aggrieved party must provide "significant probative evidence showing that there are indeed genuine issues of material fact" to prevail. Aladdin, 914 So.2d at 175(¶ 9) (quoting Murphree v. Fed. Ins. Co., 707 So.2d 523, 529 (Miss.1997)).
Mootness
¶ 5. The court held that Watts's claim was moot because it was brought after the termination of the policies. The court concluded that, since neither child died while the policies were active, Watts's claim was moot because she had never attempted, and could never attempt, to collect under the policies. We disagree.
¶ 6. The claimed injury to Watts is the amount of money she spent paying for unwanted policies for thirteen years, an injury which is not moot. Watts specifically stated in the "damages" section of her complaint: "The Plaintiffs would not have purchased the policy, or would not have been willing to do so for the amount charged. . . . The Plaintiffs have suffered damages in the amount of the difference between the value of the products as represented . . . and the substantially lower valued products as actually delivered." Therefore, the court was incorrect in finding that Watts's claim was moot. However, as discussed below, we agree that Watts's claim was time-barred, and therefore affirm.
Time Bar
¶ 7. Watts does not dispute that she purchased her initial policy in 1990, and her second policy in 1993. She also acknowledges that her claim is subject to the three-year statute of limitations found in Mississippi Code Annotated section 15-1-49, as amended. However, she contends that her claim is not time-barred because the language of the policies that she purchased was so ambiguous that she could not have determined the true nature of the policies by reading them. She also claims that the court "ignored the fact that Horace *836 Mann through its agents repeatedly represented to Mrs. Watts until 2003 that with the purchase of each policy she was receiving two policies . . . when in fact, Mrs. Watts was receiving only one policy which would expire upon the death of either insured." In short, Watts claims that "[t]he record shows a genuine issue for trial as to whether Mrs. Watts knew or should have known of her cause of action before 2003."
¶ 8. Horace Mann responds that the terms of the policies were "clear and unambiguous," and, therefore, any cause of action had to be filed within three years of Watts's purchase of the policies (1993 and 1996, respectively). Horace Mann also argues that, even if "Watts was told anything different than what was stated in the policy, the necessary elements of reasonable reliance and damages are absent as a matter of law where the policy is clear and unambiguous and no claim for benefits ever accrued."
¶ 9. In granting summary judgment to Horace Mann, the court found that "any claims or causes of action of Plaintiff are barred by the statute of limitations. . . . Watts had until 1993 to bring her action on the 1990 term life insurance policy and until 1996 to bring her action on the 1993 policy." The court found specifically that "Watts had copies of the policies and a 15-day period to review and rescind the contracts and receive a refund. Watts did not use due diligence. Further, Horace Mann did no affirmative acts or conduct to prevent discovery of any claims after tending a copy of the policy."
¶ 10. We agree with the findings of the lower court. The language of the policies was clear and unambiguous, despite Watts's arguments to the contrary. The policies clearly stated:
The simultaneous death benefit
If the Insureds die within 31 days of each other and this policy is in force on the date of the first death with all premiums paid, we will provide a simultaneous death benefit. Proof of each Insured's death must be received at the Home Office. The simultaneous death benefit will be determined as of the date the Insureds died.
The surviving Insured may purchase a new policy
Within 31 days after the date of an Insured's death, the surviving Insured may request a new policy. We will not require proof that the Insured is insurable. The new policy may be of the same coverage as this policy or any permanent plan of insurance currently being issued by us.
(emphasis in original).
¶ 11. There is no interpretation of these sections other than that the insurance would pay benefits for the death of both insureds only if they died within thirty-one days of each other. Otherwise, the second insured could automatically request a new policy, without showing proof of insurability, when the first insured died, provided that the request was made within thirty-one days of the death of the first insured. The copy provided to Watts stated in bold on the first page:
Right to examine policy for 15 days. It is important to us that you are satisfied with this policy. We hope that it meets the insurance goals for which you planned. If you are not satisfied, you may return the policy to us or the agent from whom you purchased it, within 15 days after it is delivered to you, and receive a full refund of any premiums that you have paid.
Therefore, not only were the policies clear and unambiguous, but they also encouraged Watts to carefully review her copy to ensure that she was satisfied.
*837 ¶ 12. Although Watts provided the affidavit of an "expert" on insurance matters, and Horace Mann did not present an expert for the court, we find that Watts's expert was not sufficient to overcome the motion for summary judgment. Simply put, the contract at issue in this case did not require the opinion of an expert to understand. The language of the policies is clear and unambiguous and speaks for itself. After presenting a copy of the policies, Horace Mann needed to present no further evidence to prove that the language was clear and unambiguous.
¶ 13. Watts also contends that Robert Rich, a Horace Mann executive, admitted that the policy language was ambiguous. However, a reading of Rich's deposition testimony does not reveal any admission that the policy language was ambiguous.[2] When asked whether he thought the policies were ambiguous, Rich clearly responded "no." When asked whether he thought the policy language could have been made clearer, Rich responded "not to me." He further testified that he believed the language of the policy was "pretty straightforward." The closest Rich came to admitting any problem with the policy was when he was asked: "Do you think that there should be a statement in that policy to the effect that upon the death of the first insured the policy is extinguished?" Rich responded: "Possibly. I mean, I ." Before he could explain the reasoning behind his response, he was cut off by Watts's attorney. Given the adamant nature of Rich's previous responses, the hesitant nature of his above answer, and the fact that Watts's attorney cut him off before he could fully explain his response, we find that Rich's testimony did not constitute an admission of any deficiency or ambiguity with the language of the policies.
¶ 14. As to Watts's assertion that Horace Mann or its agents fraudulently concealed the true nature of her contract, we also find that contention without merit. Although fraudulent concealment would operate to toll the statute of limitations, in order to succeed on a fraudulent concealment claim, a plaintiff must prove that: "(1) some affirmative act or conduct was done and prevented discovery of a claim, and (2) [that] due diligence was performed on their part to discover it." Stephens v. Equitable Life Assurance Soc'y of U.S., 850 So.2d 78, 84(¶ 18) (Miss.2003). There is no evidence in the present case that any diligence was exercised by Watts to discover her claim.
¶ 15. During her deposition, Watts testified that she could read and write. When asked how she suddenly discovered her claim in 2003, Watts was unable to provide a clear answer. Watts also testified that individuals who sign an insurance contract should read the contract, although she qualified her answer: "But a lot of times, what you read, you do not understand." She then went on to acknowledge that if she did not understand something in her contract, she should have asked someone at Horace Mann about what she could not understand. When Horace Mann's attorney asked: "you haven't read this policy, have you, yes or no," Watts responded: "No then." Watts later contradicted this answer when she testified that she had read the policy when she first took it out.
*838 ¶ 16. The Stephens court indicated that "whether an insured reads the entire insurance policy, the `knowledge of its contents would be imputed to them as a matter of law.'" Id. at 82(¶ 13) (quoting Cherry v. Anthony, 501 So.2d 416, 419 (Miss.1987)). As quoted in Stephens, "a person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract." Id. at 82(¶ 14) (quoting Godfrey, Bassett & Kuykendall Architects, Ltd. v. Huntington Lumber & Supply Co., 584 So.2d 1254, 1257 (Miss.1991)). Watts contends that the language of the policies was so ambiguous that an ordinary layperson would not have been able to understand the policy. Having read the language, we disagree. The language was clear, and the portion of the policies detailing the simultaneous death benefit was emphasized in order to insure that the holder of the policy understood what coverage she was receiving.
¶ 17. Watts cites a number of cases that she contends support her position. In Hunt Oil Co. v. Berry, 227 Miss. 234, 245, 86 So.2d 7, 10-11 (1956), the Mississippi Supreme Court held that a party would not be held responsible for failing to read his contract where he had asked the appellant's agent to explain the contract to him because he would not understand it if he read it. The present case is distinguished because no evidence was presented that Watts asked Horace Mann to explain the contract to her because she could not read it herself. In fact, Watts's deposition testimony indicated that she was fully capable of reading and writing, and therefore could have understood the clear and unambiguous terms of her insurance policies if she had read them.
¶ 18. Watts also cites Huntington Lumber, 584 So.2d at 1257-58, where the Mississippi Supreme Court held that a bidder was entitled to rely on the statement of a senior partner at an architectural firm. In the case, the bidder had in fact read his contract and then called the architectural firm to question an unexpected contingency clause. A senior partner at the firm, believing that the clause would be removed from the contract, told the bidder that the clause would be removed. Through the error of a junior partner, the clause was accidentally left in. It is clear from the facts of Huntington Lumber that the bidder exercised due diligence in attempting to clarify whether the contingency clause was intended to be in the contract. In the present case, by contrast, there is no evidence that Watts exercised any diligence in questioning the language of her policies.
¶ 19. In Johnson v. Brewer, 427 So.2d 118, 126-27 (Miss.1983), a Marion County Chancery Court set aside a lease because of fraud. The Mississippi Supreme Court affirmed, noting that the victim in the case was a man nearly eighty years of age, with a sixth grade education and "limited reading ability." Id. at 119. The facts are notably different in this case, where Watts testified that she is educated and fully able to read and write. No evidence was introduced indicating that Watts was unable to read the policies or lacked the capability to understand them.
¶ 20. The nature of Watts's policies, and any discrepancy between the policies and what had been represented to Watts, were discernable from a reading of the policies. Therefore, Watts failed to exercise due diligence in discovering her claim against Horace Mann, and cannot claim fraudulent concealment. Without any fraudulent concealment, Watts had until 1996, at the latest, to file her claim against *839 Horace Mann. Therefore, Watts's 2003 claim is time-barred, and the court did not abuse its discretion in granting summary judgment to Horace Mann.
Suitability
¶ 21. For the first time on rehearing, Watts alleges as a basis for a claim that the policies were not suitable for her needs. Either as an independent ground for recovery or as an additional argument to support fraud, this argument is presented too late in the proceedings to require examination. We examine only what was presented to the trial court on summary judgment, and affirm.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF SHARKEY COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ., CONCUR.
NOTES
[1] The previous opinion of the Court is withdrawn and this opinion is substituted. The motion for rehearing is denied.
[2] Rich's deposition was not included in the record, but an excerpt from it was included with Watts's brief. Although we do not have a complete copy of the deposition, it is clear even from the excerpt provided by Watts that Rich did not admit any deficiency with the language of the policies.